TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0102
     Facsimile: (213) 894-6269
     E-mail:    andrew.brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:21-cr-00210-MCS-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT SPIRIDON; DECLARATION OF SA PERSAUD |
| v. | |
| CONSTANTIN VORNICU and COSMIN SPIRIDON, | Hearing: February 14, 2022        3:00pm |
| Defendants. | |

**I.   OBJECTIONS TO THE PRESENTENCE REPORT**

The government has two objections to the PSR.  First, defendant lied to the Probation Officer about the length of his involvement in the offense.  Accordingly, he has not accepted responsibility, but instead has attempted to obstruct justice.  Second, the identified losses in this case are a small fraction of the true losses, requiring the Court to estimate the true loss, which is far greater than the losses set forth in the PSR.

1

### A. DEFENDANT VORNICU LIED ABOUT HIS EMPLOYMENT AND ENTRY DATE INTO THE U.S.

According to defendant Spiridon, he was employed through January 2019 in Romania full-time as a delivery driver. (PSR ¶ 96). He claims he did not enter the U.S. until October or November of 2019. (PSR ¶ 84). This is a lie: defendant rented a car in his true name in Chicago in December of 2017, and in Long Beach in March of 2018 (decl. ¶ 2), and was captured on ATM surveillance video committing fraud in Michigan in January of 2018 (PSR ¶ 16), almost two years earlier than he claims even to have entered the U.S., and a full year before he claims he left his full-time employment in Romania. Further, he posted images of himself to Facebook in at least two different American rental cars in September 2018 and March 2019, which appear to be in the Midwest, and in May 2019 which appears to be in California. (Decl. ¶ 2). Defendant was not in the U.S. continuously since late 2017, however. He was deported on April of 2018 (PSR ¶ 77), but judging from his Facebook posts, re-entered months later. (Decl. ¶ 2). Defendant has falsely attempted to minimize the length of his participation on the fraud to trick the Court into imposing a lighter sentence on him.

Where a defendant has "provid[ed] materially false information to a probation officer in respect to a presentence" report, the obstruction of justice enhancement applies. USSG § 3C1.1, app. note 4(H). C.f., United States v. Barnes, 125 F.3d 1287, 1292-93 (9th Cir.1997) (defendant subject to enhancement for failing to inform the probation officer about a fourth marriage in which he was subject to a temporary restraining order due to violent conduct to

his former spouse because it had the potential to influence sentencing in his offense of fraudulently impersonating a doctor).

"Conduct resulting in an enhancement under § 3C1.1 (Obstruction . . . of Justice) ordinarily indicates that the defendant has not accepted responsibility. . . ." USSG § 3E1.1, app. note 4. It is the defendant's burden to establish that he has "clearly" accepted responsibility for his offense. United States v. Alexander, 48 F.3d 1477, 1493 (9Th Cir. 1995); USSG § 3E1.1(a). A "defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." USSG 3E1.1, app. n. 1(A).

Here by falsely minimizing the time he was in the U.S. and therefore able to commit the fraud, and by falsely claiming to have been honestly employed during those extra years, defendant has failed to accept responsibility and instead has attempted to obstruct justice.

**B.  ESTIMATING LOSS IS REQUIRED WHEN ACTUAL LOSS IS LARGELY UNAVAILABLE, AS HERE**

Here, actual loss is unknown. The defendants counterfeited at least a thousand ATM cards (PSR ¶ 35), and probably many tens of thousands of cards over the course of their conspiracy. They frequently traveled to other cities to minimize the chance that law enforcement would detect or apprehend them. Some of their known fraud was as far away as Michigan. (PSR ¶¶ 16, 55). Because they used so many different cards, there usually was no way for law enforcement to link the fraud on one card with the fraud on another absent ATM video showing the defendants making the withdrawals or installing the skimming devices. But with the defendants traveling

3

across the country, it was almost impossible for agents to visually match fraudulent ATM withdrawals: no agent has time to review the video of suspected fraudulent ATM activity across the nation looking for photographs of the defendants. (Decl. ¶ 3).

"In sentencing a defendant for fraud the district court must make a reasonable estimate of the victim's loss." United States v. Gossi, 608 F.3d 574, 581 (9th Cir. 2010) (citations and quotations omitted). "The court need only make a reasonable estimate of the loss." USSG § 2B1.1, app. note 3(C). Estimates need not be elaborate or precise. E.g., United States v. Kelly, 993 F.2d 702, 704 (9th Cir. 1993) (affirming district court's estimate of loss in counterfeit steroid case by doubling defendant's illicit revenue as it "represented only a fraction of the business Kelly had done and intended to do"); United States v. Treadwell, 593 F.3d 990 (9th Cir. 2010) (affirming as a reasonable estimate the district court's decision to attribute 100% of the Ponzi scheme's $44 million in losses to one defendant and 50% to another who joined later and was less involved). Because the "sentencing judge is in a unique position to assess the evidence and estimate the loss" the "court's loss determination is entitled to appropriate deference." USSG § 2B1.1, app. note 3(C).

A common method of estimating loss is through extrapolation, which is listed as one of the techniques for doing so in the sentencing guidelines. E.g., USSG § 2B1.1, app. note 3(C) and 3(C)(iv), (vi) ("The estimate of loss shall be based on available information . . . such as" . . . . "[t]he approximate number of victims multiplied by the average loss to each victim" and "the scope and duration of the offense."). Accordingly, the Ninth

Circuit has repeatedly endorsed estimating total loss by extrapolating loss from a small period of time or a small number of victims to a larger one.  See, United States v. Scrivener, 189 F.3d 944, 949-950 (9th Cir. 1999) (affirming an estimate that extrapolated total loss from a small sample of victims); United States v. Caldwell, 626 Fed.Appx. 683, 688 (9th Cir. 2015) (affirming district court's loss estimate which "extrapolated estimated loss amounts for the prior five years").

    The government believes it is important to be cautious in extrapolating loss.  While the guidelines only require a "reasonable estimate" of loss, USSG § 2B1.1, app. note 3(C), established by "a preponderance of the evidence," USSG § 6A1.3 commentary, the government suggests that the Court err on the side of leniency when extrapolating.  That is, the government suggests using a conservative loss per period or per victim, and a conservative number of periods or victims.  Finally, if the Court believes the resulting estimated loss risks being too high, it should reduce the estimate until the Court is confident that it is *less* than the true loss.  Cf. United States v. Wilson, 900 F.2d 1350, 1355-56 (9th Cir. 1990) (affirming district court's estimate of intended loss in attempted sale of trade secrets case which arbitrarily reduced the victim company's "ball park estimate" of value by 75%).  But it would be an abdication of the Court's responsibility to make a reasonable estimate of the loss to reject extrapolation entirely when it is clear, as here, that the criminal conduct extended over years for which loss data is not available.

### C. DEFENDANT SPIRIDON WROTE HIS CO-CONSPIRATORS THAT HE WITHDREW $72,700 FROM ATMS IN SEVEN DAYS

Here, we have detailed information from which the actual loss can be extrapolated. On December 28, 2020, defendant Spiridon stated in an encrypted WhatsApp conversation with his co-conspirators including defendant Vornicu, "In total there are 45,800 from the first 5 days" and "Yesterday I took 23,500 and today 3400. Total 26900. Overall total 45800 + 26900. 72,700", indicating that his total withdrawals from ATMs over those seven days was $72,700. (PSR ¶ 24). Of course this does not tell the full story. Defendant Spiridon wrote "*I* took" this amount. We do not know what co-defendant Vornicu took during this time, or what any other co-conspirators took. This presents an opportunity for caution: the government suggests that in extrapolating loss, the Court assign a zero value for the take of any other co-conspirator, including co-defendant Vornicu. While unrealistic, this assumption will ensure that the extrapolation is conservative.

### D. SPIRIDON'S ATM WITHDRAWALS BEGAN IN 2018

As discussed above, defendant Spiridon was first photographed committing ATM fraud in the U.S. in January of 2018. (PSR ¶ 16). Because he could not work legally in the U.S., was not observed to work at all, and spent money freely, it is very probable that he was engaged in ATM skimming from that date. (PSR ¶¶ 25-28). To be sure, there was at least one period of unknown duration in 2018 in which defendant was outside the U.S. (PSR ¶ 77; Decl. ¶ 2). We have no way of knowing whether he was practicing his ATM fraud trade in another country then, or whether that period was a genuine vacation from this conspiracy. To be very conservative, the

6

government suggests extrapolating the stated ATM withdrawals over the period beginning on December 12, 2019, when both defendants were captured by Comerica Bank ATM surveillance cameras committing fraud, thereby excluding two earlier years of defendant Spiridon's fraud. (PSR ¶ 17.) Because the defendants were arrested on April 8, 2021, this period encompasses over 68 weeks.

### E. CONSERVATIVE EXTRAPOLATED LOSS: $4.2 MILLION.

To make the calculations simpler, the government recommends rounding down the stated loss of $72,700 in a week to $70,000, and the number of weeks from 68 to 60. Doing so results in an extrapolated actual loss of $4.2 million, and a guideline loss enhancement of +18. USSG § 2B1.1(b)(1)(J).

### F. FINAL GUIDELINE RANGE

If the Court finds that defendant failed to accept responsibility (negating a -3 adjustment) and attempted to obstruct justice (adding a +2 adjustment), and used the +18 loss enhancement called for by the conservative extrapolation described above, then defendant's final offense level would be 33, resulting in a guideline range of 135-168 months in criminal history category I.

## II. THE 3553(A) FACTORS

### A. DEFENDANT HAS HIDDEN HIS ILLICIT PROCEEDS TO FUND A LAVISH POST-PRISON LIFESTYLE IN ROMANIA

Defendant clearly made a great deal of money in this case. He liked to rent American muscle cars and condos by the beach, and drive from ATM to ATM depleting the balances of their victims. (PSR ¶¶ 27-28). Indeed, according to defendant Spiridon's own words, he withdrew $72,700 in a single week. (PSR ¶ 24). Considering that

7

the defendants have been doing so for years, this works out to an extraordinary sum of money for anyone, and all the more so for someone who lives in Romania when he is not looting ATMs internationally. (Vornicu PSR ¶¶ 91, 108: medical pension in Romania $140 per month, apartment in Romania $15,000). In past cases involving foreigners engaged in ATM skimming, they have transferred their cash abroad using techniques ranging from Hawalas, to overnighting packages of cash hidden in other items, to cryptocurrency. We do not know all the ways in which the defendants in this case moved their cash, only that the government failed to locate or seize any significant portion of it. This means that after the defendants serve their prison terms in this case, they will be able to live lavishly in their home country. Regrettably, many persons would be willing to serve a modest prison sentence in exchange for great wealth afterwards. It is imperative, therefore, that the Court impose a prison sentence long enough so that others will not wish to follow in defendant's footsteps.

## CONCLUSION

The defendants illegally entered our country years ago for one purpose—to take advantage of the weaker ATM security here, which does not require cards containing computer chips. They pursued fraud like a full-time job, netting millions of dollars in illicit proceeds, which have not been recovered. Only a lengthy prison term could change the calculus for defendants and their co-conspirators, and persuade them that even the low risk of apprehension here outweighs the huge rewards they have already hidden away for themselves to spend when they are released from prison. Mindful of the parsimony principle, the government recommends a sentence for

defendant Spiridon of 100 months in prison, below the guideline range the government believes applies.  While defendant has done little to warrant leniency, the government is reluctant to recommend a guideline sentence because there is no evidence that defendant has been to prison before.  It is to be hoped that a 100-month sentence, or about seven years actual prison adjusted for available good-time credits, will be sufficient to deter defendant.

Dated: January 25, 2022         Respectfully submitted,

　　　　　　　　　　　　　　　　TRACY L. WILKISON
　　　　　　　　　　　　　　　　United States Attorney

　　　　　　　　　　　　　　　　SCOTT M. GARRINGER
　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　Chief, Criminal Division

　　　　　　　　　　　　　　　　*Andrew Brown*
　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　ANDREW BROWN
　　　　　　　　　　　　　　　　Assistant United States Attorney

　　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　　UNITED STATES OF AMERICA

**Declaration of Rene Persaud**

I, RENE PERSAUD, do hereby declare and affirm:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2018, and have served in law enforcement since 2011. I am assigned to investigate ATM skimming frauds, mostly conducted by organized crime groups, mostly from Romania. I have received specialized training in doing so.

**SPIRIDON Has Been In the U.S. Since 2017**

2. The earliest record I found of defendant Spiridon in the U.S. was in December of 2017, when he rented a vehicle in Chicago in his true name. It appears that he then drove to Michigan, where he was photographed committing ATM fraud in January of 2018. There is evidence that defendant Spiridon remained in the U.S. for most of the time thereafter. Business records show that he rented a vehicle in Long Beach in March of 2018. Further, he posted images of himself to Facebook in at least two different American rental cars in September 2018 and March 2019, which appear to be in the Midwest, and in May 2019 which appears to be in California. Defendant was not in the U.S. continuously since late 2017, however. He was deported in April of 2018, but judging from his Facebook posts, re-entered months later.

**The Actual Losses Are Unknown**

3. We have very little actual loss data for several reasons. The defendants targeted EDD cards, as they were low-security and did not employ chips, like most debit and credit cards. The banks, therefore, generally do not know how much money was stolen off the cards: they typically cannot distinguish between withdrawals made

by genuinely disabled or unemployed persons seeking to obtain their own benefits off of their own EDD cards, or instances when the defendants used duplicate versions of those cards to steal those benefits.  There are over 3,000 financial institutions in the U.S., and our documented actual losses are based on the reports of only two.  In the main, our actual loss data stems for a chain of events that went something like this:  (1) a customer noticed withdrawals from his account that appeared not to have been made by an account holder and reported it their bank; (2) the victim bank determined that the fraud was so significant that it was worth contacting a detective; (3) law enforcement then obtained ATM video of the fraudulent withdrawals and the video showed at least one member of this conspiracy making the withdrawal; and (4) somehow that information was presented to me.  This combination is unlikely to occur.  Most banks only keep their ATM surveillance video for 30 or in some cases 60 days, so there is a good chance that the video would have been overwritten before law enforcement tried to get it.  Similarly, banks vary greatly in how helpful they are when law enforcement seeks information; some do not respond at all.  Perhaps most importantly, while law enforcement agencies try to share information and help one another, it is unlikely that a detective in, say, San Diego, would learn enough about my investigation to know to refer to me a similar ATM skimming incident in that city.  Indeed, the conspirators in this case took advantage of that fact and repeatedly rented cars and drove to other cities to conduct their fraud so that they would not be operating in a "hot" area.

///

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: January 12, 2022

/s *Rene Persaud*

Special Agent Rene Persaud